# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert M. Dow, Jr. | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 12 C 4116 | **DATE** | 2/5/2013 |
| **CASE TITLE** | Lance vs. Betty Shabzz Int'l School, et al. | | |

**DOCKET ENTRY TEXT**

For the reasons stated below, Defendants' motion to dismiss [20] is granted. Plaintiff's federal claims are dismissed with leave to replead within 28 days. If Plaintiff decides not to replead, Plaintiff's federal claims will be dismissed with prejudice and the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss those claims without prejudice.

■[ For further details see text below.]   Docketing to mail notices.

# STATEMENT

**I.   Background**

The factual background is drawn from Plaintiff's complaint. At this stage in the proceedings, the Court assumes all well-pled allegations to be true and draws all reasonable inferences in Plaintiff's favor. See *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Plaintiff Michael Lance's 40-page, 184-paragraph, 19-count complaint describes a variety of disputes that he had with employees of Betty Shabazz International Charter School (BSIC) about his employment as an art teacher and his son's treatment as a student. According to the school's website, BSIC is "a network of three African-centered charter schools serving K-12 students residing in Chicago: Betty Shabazz Academy (grades K-8), Barbara A. Sizemore Academy (grades K-8) and DuSable Leadership Academy (grades 9-12)." See http://www.bsics.net/ (last visited January 26, 2013). Plaintiff was employed by BSIC and worked at the Barbara A. Sizemore Academy (BASA) as an art teacher from August 2008 until March 2012. Plaintiff's four-year-old son, Myko, attended BASA from September to November 2011.

Plaintiff's complaint begins with allegations that he "suffered internal injuries" in the spring of 2010 from construction on an elevator near his classroom at BASA. He reported "the incidents" to BASA's principal, Defendant Walton, and to Defendant Daniels, BSIC's CFO, among others. Defendants allegedly refused his request to change rooms, put up safety barriers, and test the air quality. In early summer 2010, Plaintiff alleges that "it was determined" that he and his son, who occasionally came to school with his dad, "had been exposed to lead (asbestos fibers) as a result of the construction." Compl. ¶ 28. Plaintiff wanted Defendants to put up a "Lead Hazard" sign and protective screens. Defendants refused. Compl. ¶ 28. Plaintiff "reported" his medical bills to Daniels, and Daniels allegedly told Plaintiff to gather his receipts and bills so BSIC could pay his expenses. Compl. ¶ 29. When Plaintiff submitted his bills and receipts to Daniels, Daniels refused to pay and threatened legal action against Plaintiff. Compl. ¶ 30.

In September 2011, Plaintiff was on the interview team to pick a teacher for the K-1 class that his son would attend. According to the complaint, it was "rumored" that Plaintiff did not want Defendant Jones to be the new teacher. Despite Plaintiff's (rumored) opposition, Jones was selected to teach the class, and that is where Plaintiff's son was placed. Plaintiff believes that Jones treated his son harshly because of his rumored opposition to her getting the position. Compl. ¶¶ 36-37. In response to a request from Plaintiff, Walton transferred Plaintiff's son to Defendant Hood's K-1 class. In October 2011, Plaintiff noticed that "Defendant Hood began to mistreat Myko in the same manner as Defendant Jones." Compl. ¶ 39. Lance alleges that "Defendant Hood would isolate Myko * * * . Defendant Hood would intentionally write Myko up for bogus uniform violations, and she would often take his lunch." Compl. ¶ 40. Plaintiff "believed that Defendants [sic] Hood [sic] behavior toward Myko was due to his biracial make up [sic]." Compl. ¶ 42.

Plaintiff requested a meeting to discuss his son's alleged mistreatment and how the situation could be improved. On November 17, 2011, there was a meeting with Defendants Walton, Jones, Hood, Kheperu, and a counselor. According to Lance, Walton walked out of the meeting, and Jones yelled "making it difficult for the parties involved to resolve any issues and concerns the parties may have had concerning Myko." Compl. ¶ 44. Two days later, Walton called Lance to her office, summarized the meeting, and "placed the blame for its failure on [Lance]." Compl. ¶ 46. At another meeting later that same day, Walton told Lance that his son could not return to BASA. Lance alleges that Walton refused to put her statement in writing. Compl. ¶ 46. At about the same time, Lance again asked Walton for an air quality test. Walton referred him to someone else at BSIC. Compl. ¶ 47. In December 2011, Lance "repeatedly requested a hearing and explanation for Myko's expulsion from BASA." The Defendants denied his request. Compl. ¶ 49.

On January 25, 2012, Plaintiff had a disagreement with another teacher, Takara Davis, about art supplies. Davis reported the incident to Walton, and Walton allegedly encouraged Davis to submit a written complaint. Compl. ¶ 51. Plaintiff claims that around this time Jones and Hood "would openly taunt [him] in order to bait him into a confrontation." Compl. ¶ 53. Plaintiff complained to Walton that the teachers' conduct was interfering with his work, but Walton allegedly ignored his complaints. Compl. ¶ 53.

Also in January 2012, Plaintiff claims to have filed a complaint with the United States Department of Education, Equal Employment Opportunity Commission, and Labor Department about his treatment as an employee and his son's expulsion. Compl. ¶ 54. Lance believes that Defendants Walton, Kheperu, and Daniels got notice of his complaint and that "Defendant Walton's negative attitude toward Lance increased." Compl. ¶ 55.

On March 15, 2012, Plaintiff had Jones' class for art. Jones told Plaintiff that she did not want certain kids to participate, and Plaintiff responded that if she wanted to punish particular students she would have to keep them with her in her class. Compl. ¶ 56. Plaintiff claims that when he brought the students that Jones did not want participating in art back to her class, "Jones hit and pushed him in anger." Compl. ¶ 57. Plaintiff reported the incident to Walton and Walton allegedly told Jones to call the police. Compl. ¶ 58. The police came to the school and, according to Plaintiff, Jones admitted to pushing him. Compl. ¶ 59. Plaintiff claims he was so "shaken" by the incident that he had to take the next day off. Compl. ¶ 60. On March 22, 2012, Walton accused Plaintiff of "committing an assault and battery" and placed him on administrative leave. Compl. ¶ 63. The next day, Lance's lawyer made a written request for a meeting. On March 29, 2012, Plaintiff received a termination letter from Walton.

In May 2012, Plaintiff, through counsel, filed the complaint in this case. The complaint purports to state nineteen separate claims for violations of Plaintiff's and his son's state and federal rights. Defendants moved

to dismiss for failure to state a claim under Rule 12(b)(6) or, in the alternative, for a more definite statement under Rule 12(e). In response to Defendants' motion, Lance voluntarily dismissed Count I (denial of student records), Count III (racial discrimination), Count V (invasion of privacy), Count VIII (educational abandonment), Count IX (intentional destruction of student records), Count X (42 U.S.C. § 1983); Count XI (42 U.S.C. § 1985); Count XII (42 U.S.C. § 1986); Count XVII ("ultra hazardous activity, asbestos management"); Count XVII (poor indoor air quality); Count XIX (First Amendment). Those counts are dismissed.

Plaintiff opposes Defendants motion to dismiss his remaining state and federal counts. Plaintiff alleges federal claims in two of those counts: Count II (denial of due process and equal protection for Lance's termination and Myko's expulsion) and Count IV (retaliation for filing a complaint with federal agencies). In addition, Plaintiff believes that his complaint states six claims under Illinois law: Count II (due process under Illinois law), Count VI (defamation), Count VII (intentional infliction of emotional distress), Count XIV (breach of contract), Count XV (reliance), and Count XVI (misrepresentation).

## II. Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

## III. Analysis

### A. Federal Claims

#### 1. Due Process (Count II)

A couple points of order to begin: First, Plaintiff attempts to assert his due process claims directly under the Federal Constitution. In reviewing Defendants' motion to dismiss, the Court will assume that Plaintiff intended to bring his federal due process claims pursuant to 42 U.S.C. § 1983. Second, the heading for Count II mentions due process and equal protection. However, based on the facts provided and referenced in Count II, the request for relief at its conclusion — "Plaintiff respectfully requests that this Honorable Court find that

## STATEMENT

Defendant(s) engaged in conduct against Plaintiff and his son that denied them proper Notice and Hearing under the Due Process Clause of both the State of Illinois and the United States of America Constitution, and enter a judgment in favor of Plaintiff" — and Plaintiff's brief opposing Defendants' motion to dismiss, see [30 at 5], the Court concludes that Plaintiff's claims in Count II concern deprivations of due process only, and that Plaintiff's reference to equal protection in the heading is surplusage.[1]

> [FN 1] Even if the Court assumes that Plaintiff attempted to state an equal protection claim in Count II, he has not successfully done so. A plaintiff asserting an equal protection violation must establish that a state actor has treated him differently because of his membership in a particular class and "that the state actor did so purposefully." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000); *Sherwin Manor Nursing Center, Inc. v. McAuliffe*, 37 F.3d 1216, 1220 (7th Cir. 1994). Discriminatory purpose "implies that the decision-maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on an identifiable group." *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982). Plaintiff does allege that he believed that Hood and Walton disliked Plaintiff's son because of his race, but his allegations go no further than those bare assertion about Hood and Walton's beliefs, while, in the same breath, he offers detailed accounts of many other reasons Defendants may have had a problem with Plaintiff and his son. For instance, Plaintiff's complaint goes on at length about Defendants' conflicts with Plaintiff over teaching methods, construction problems and air quality, selection of a K-1 teacher, who was responsible for a scuffle between Lance and Jones, and the process (or lack thereof) that resulted in Plaintiff's firing and his son's expulsion. Considering the allegations in Plaintiff's complaint as a whole, he has not plausibly alleged an equal protection claim in Count II. Moreover, Plaintiff has not alleged that his son was *expelled* because of his race, and, if nothing else, it is clear that Count II is about dismissal — Plaintiff's dismissal from his teaching position and Plaintiff's son's dismissal from kindergarten.

The Fourteenth Amendment imposes constraints on government actions which deprive an individual of "liberty" or "property" interests within the meaning of the Due Process Clause. See *Mathews v. Eldridge,* 424 U.S. 319, 332 (1976). To assert a violation of the Due Process Clause, Plaintiff must be able to show that he or his son had a "property interest" and at least one of them was deprived of that interest without due process of law. See *Phelan v. City of Chicago,* 347 F.3d 679, 681 (7th Cir. 2003) (citing *Bishop v. Wood,* 426 U.S. 341, 343 (1976)).

To demonstrate a deprivation of a protected interest, Plaintiff "must first establish that [he or his son] had a property interest * * * of the sort that the Constitution protects." *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996). Property interests are not created by the United States Constitution; "[r]ather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Moore v. Muncie Police and Fire Merit Com'n*, 312 F.3d 322, 326 (7th Cir. 2002) (citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Count II covers two possible due process claims: a claim based on Plaintiff's dismissal from his job as a teacher and a separate claim for his four-year-old son's "expulsion." The Court first will consider Plaintiff's claim about his own dismissal. For a fired public employee bringing a procedural due process claim against his employers, "[a] property interest in continued employment 'can be created in one of two ways, (1) by an independent source such as state law securing certain benefits; or (2) by a clearly implied promise of

continued employment.'" *Palka v. Shelton*, 623 F.3d 447, 452 (7th Cir. 2010) (citing *Phelan*, 347 F.3d at 681). Plaintiff bears the burden of proving that he had a property interest in his employment as a teacher. See *Krieg v. Seybold,* 481 F.3d 512, 520 (7th Cir. 2007) (holding plaintiff bears the burden of showing that he had a property interest in his job arising out of a state statute, state or municipal regulations, or a contract with a public entity). In this case, Plaintiff admits that he was an "at will" employee. Compl. ¶ 161. As an at-will employee, Plaintiff does not have a property interest in continued employment protected by the Due Process Clause. See, *e.g.*, *Harris v. City of Auburn*, 27 F.3d 1284, 1286 (7th Cir. 1994) ("Our cases make clear that an at-will employee does not have a constitutionally protected property right in his continued employment."); *Burke v. Chicago School Reform Bd. of Trustees*, 169 F. Supp. 2d 843, 847 (N.D. Ill. 2001) ("although a substantive property interest in one's job might arise if the terms of the employment are governed by contract, there is no such interest in an at-will employment situation").

Plaintiff's second due process claim concerns his son's expulsion from BASA. To survive Defendants' motion to dismiss this claim, Plaintiff must have alleged that (1) his son had a property interest in attending BASA and (2) he was deprived of that interest without due process. Plaintiff's complaint is deficient on both points. First, although states "may not be constitutionally obliged to establish and maintain a public school system," if a state does establish a public school system, "[t]hose young people do not 'shed their constitutional rights' at the schoolhouse door." *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506 (1969)). The first question is thus whether Illinois has established a public school system that gives four-year-olds the right to attend schools like BASA. Illinois obviously has some kind of public school system. But without any comment from Plaintiff about the source of his son's alleged property interest, the Court will not assume that he had a constitutionally protected property interest in attending BASA as a four-year-old.

*Goss* is instructive. In that case, the Supreme Court considered the constitutionality of an Ohio law that allowed public school principals unilaterally, without any additional process, to suspend students for up to ten days. 419 U.S. at 567. The Supreme Court held that Ohio's law was deficient because it did not provide for notice of the charges and an opportunity for the student to tell his or her side of the story. *Id.* at 581. But the Supreme Court only reached that conclusion, about the inadequate process required by Ohio law, after observing that Ohio law provided for "free education for all children between the ages of six and 21." *Id.* at 568, 574. That is, the Supreme Court had already concluded that the plaintiffs (high school students, in that case) had a constitutionally cognizable property right created by state law. In this case, by contrast, Plaintiff does not allege a property right based on Illinois law, or anything else. If Plaintiff were making a due process claim about his son's right to a high school education, or even to an elementary school education, the Court would be less concerned about this particular deficiency of his complaint, and the Court would likely infer a property right from the fact that the student claimed to be a public high school student in Chicago, for instance. But this case is about the due process rights of a four-year-old. Plaintiff's complaint is silent, and the Court cannot simply assume that a four-year-old had a property right in continued education at BASA. See, *e.g., Lee v. County of Cook,* 862 F.2d 139, 141-42 (7th Cir. 1988) (affirming dismissal of state employee's third amended complaint where plaintiff did not allege facts showing a property interest in her job); *Smith v. Bd. of Educ. of Urbana School Dist.,* 708 F.2d 258, 264-65 (7th Cir. 1983) (affirming dismissal for failure to state a claim where plaintiff's complaint did not allege facts from which a property interest in employment could be inferred).

Plaintiff's failure to allege that (and on what basis) his four-year-old son had a cognizable property interest in continuing his education at BASA dooms Plaintiff's due process claim based on his son's expulsion. But even assuming that Plaintiff's son had a cognizable property interest, Plaintiff would also fail to state a claim

based on the second due process consideration: whether there was a deprivation of that property interest *without due process of law*. Due process "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 618 (7th Cir. 2002) (quoting *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) and *Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895 (1961)). That said, in cases involving school expulsion, the Seventh Circuit has explained that:

> To comport with due process, expulsion procedures must provide the student with a meaningful opportunity to be heard. The proceedings need not, however, take the form of a judicial or quasi-judicial trial. As long as the student is given notice of the charges against him, notice of the time of the hearing, and a full opportunity to be heard, the expulsion procedures do not offend due process requirements.

*Remer v. Burlington Area Sch. Dist.*, 286 F.3d 1007, 1010-11 (7th Cir. 2002) (internal citations and quotations omitted). That is also the lesson of *Goss*, which explained that public school students facing serious school discipline (in *Goss*, suspensions) are entitled to notice of the charges against them and a chance to be heard. 419 U.S. at 581. The particulars of the notice and hearing required — what kind of notice is required, how formal the hearing must be, for instance — will depend on the circumstances. *Id.* at 582, 584.

In this case, Plaintiff had a pre-deprivation meeting with a large group of BASA officials, including his son's teachers, the principal, and a board member. Plaintiff does not suggest that he had insufficient notice of the meeting. Plaintiff does not suggest that he was denied an opportunity to give his side of the story, although he does allege that tempers flared. Two days later, Plaintiff had another meeting, this time with the principal alone, where Plaintiff and the principal reviewed the previous meeting. Later that day, Plaintiff met with the principal again, and he was then informed that his son was no longer welcome at BASA. According to his complaint, Plaintiff admits that he had notice and at least two hearings. That satisfies *Remer*. Plaintiff would like another meeting and he would like BASA to put its decision in writing. But Plaintiff has not provided, and the Court has not found, authority suggesting that in a circumstance like this that pre- *and* post-deprivation hearings or a written decision are required to satisfy due process.

### 2. Retaliation (Count IV)

Plaintiff alleges that Defendants retaliated against him in violation of Title VI of the Civil Rights Act of 1964. Title VI provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI's implementing regulation prohibits retaliation: no recipient of federal funding "shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by [Title VI] * * * because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VI]." 34 C.F.R. § 100.7(e); see also *Nevarez v. Cmty. Unit Sch. Dist. No. 300*, 2011 WL 1113406 (N.D. Ill. Mar. 24, 2011).

Plaintiff has voluntarily dismissed his claim for discrimination in violation of Title VI (Count III). His remaining Title VI claim is for retaliation only. Plaintiff has not alleged that he was a victim of race discrimination nor has he alleged a basis for a retaliation claim as a result of anything that Defendants did to him personally. Plaintiff comes closer to stating a retaliation claim based on actions Defendants allegedly

took against his son in response to his "proactive activities as a concern [sic] parent and teacher." Compl. ¶ 102.

The fundamental problem with a claim that Defendants retaliated against Plaintiff's son in violation of Title VI is that Plaintiff does not allege that he (or his son) "made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VI]," *i.e.*, that he engaged in a protected activity, prior to his son's dismissal from BASA. As detailed in Section I, Plaintiff alleges that he complained to teachers and administrators at BASA about a range of issues, but, despite all that he did complain about, Plaintiff does not allege that he complained about race discrimination. See *Nevarez*, 2011 WL 1113406, at * 3 (stating a Title VI retaliation claim where plaintiff alleged (1) "she * * * voic[ed] concerns and complaints to administrators at the school level and the school district's Title III Office over the discriminatory and unfair treatment of Hispanic ELL students and her based on national origin; and (2) the School District engaged in a pattern of retaliation and harassment against [her]"); *Sawyer v. Columbia College*, 2010 WL 3081260, at *8 (N.D. Ill. Aug. 5, 2010) (stating a Title VI retaliation claim by alleging that plaintiff complained to defendant about race discrimination prior to adverse action).

Plaintiff does make some race-related allegations: he believed that Hood "demonstrat[ed] her racial bias" by treating his son differently than other students and that Walton "ignored the mistreatment he thought his son received, because of Defendants [sic] dislike for him and his biracial identity." But, again, Plaintiff is not alleging simple race discrimination; he has voluntarily dismissed that claim. Without an allegation that he complained about race discrimination or that Defendants somehow knew that he had complained about discrimination — in a complaint to Defendants or the government, for instance — Plaintiff has not stated a Title VI retaliation claim. As much as the Court is required to view Plaintiff's complaint in a favorable light and draw all reasonable inferences in his favor, it is not permitted to manufacture the basic allegations required to state a claim. That is to say, on these facts, the Court cannot infer from Plaintiff's belief that certain Defendants disliked his son because of his race that Plaintiff must have made that belief known to Defendants prior to Plaintiff's son's dismissal.[2]

> [FN 2] Plaintiff does not allege that he complained of race discrimination in his January 2012 complaints to the EEOC, United States Department of Education, or United States Department of Labor. According to his complaint in this case, Plaintiff's complaints to the government asked for an "open investigation into his treatment as an employee of BASA/BSIC, and Myko [sic] expulsion from BASA without Notice and Hearing." Compl. ¶ 54. In any event, Plaintiff made his complaints to the government after his son was expelled and months before he was put on administrative leave and then fired following an altercation with another teacher.

### B.     State Law Claims

Plaintiff has not stated a federal claim, and the Court must now decide whether to retain jurisdiction over his state law claims. See 28 U.S.C. § 1367(c)(3). The Seventh Circuit, animated by the principle of comity, consistently has stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly,* 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.,* 55 F.3d 331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.,* 6 F.3d 1176, 1182 (7th Cir. 1993); see also *Wright v. Associated Ins. Co.,* Inc., 29 F.3d 1244, 1251 (7th Cir. 1994) ("When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction * * * "); see also *Horton v. Schultz,* 2010 WL 1541265, at *4 (N.D. Ill. 2010).

| STATEMENT |
|---|

In *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251–53 (7th Cir. 1994), the Seventh Circuit noted that there occasionally are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine judicial economy, convenience, fairness, and comity-will point to a federal decision of the state-law claims on the merits." The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id.* at 1251. That concern is not present here, however, because Illinois law gives Plaintiff one year from the dismissal on jurisdictional grounds of state law claims in federal court in which to re-file those claims in state court. See 735 ILCS 5/13–217; *Davis v. Cook County,* 534 F.3d 650, 654 (7th Cir. 2008). Dismissal without prejudice of the state law claims also is appropriate here because the case is only at the motion to dismiss stage and substantial judicial resources have not been committed to the state law counts in Plaintiff's complaint. *Wright,* 29 F.3d at 1251. Finding no justification for departing from that "usual practice" in this case, the Court dismisses without prejudice Plaintiff's state law claims without discussing their merit under state law.

***

Based on the foregoing discussion, all of Plaintiff's claims, at least as currently cast, are subject to dismissal. Plaintiffs whose complaints are dismissed through a successful Rule 12(b)(6) motion generally are allowed an opportunity to replead. See, *e.g.*, *Smith v. Union Pac. R. Co.*, 474 Fed. Appx. 478, 481 (7th Cir. Apr. 5, 2012). If — consistent with Rule 11 — Plaintiff believes that he could amend his complaint to overcome the problems the Court has identified, he may do so within 28 days. If Plaintiff decides not to file an amended complaint within 28 days, his federal claims will be dismissed with prejudice and the court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss them without prejudice.

**IV. Conclusion**

For the reasons stated above, Defendants' motion to dismiss [20] is granted. Plaintiff's federal claims are dismissed with leave to replead within 28 days. If Plaintiff decides not to replead, Plaintiff's federal claims will be dismissed with prejudice and the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims and dismiss those claims without prejudice.